EDWARD J. BERMAN, ADMR.
ESTATE OF ROSE S. HALL, IN EQUITY
*vs.*
SIGMUND FRENDEL ET AL.

Cumberland.   Opinion, January, 1959.

*Berman, Berman & Wernick,*
*John J. Flaherty,* for plaintiff.

*Simon Spill & Louis Spill,*
*John E. Willey,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, DUBORD, SIDDALL, J. SULLIVAN, J., did not sit.

WILLIAMSON, C. J. On report. This is a bill in equity by an administrator c.t.a. for construction of the will of Rose S. Hall, late of Portland, for determination of the ownership of certain savings bonds, and for instructions for the disposition of bequests to two institutions. Philip Frendel and Max Frendel, beneficiaries under the will, were permitted to join as parties plaintiff.

The testatrix, who executed her will on May 16, 1940, died on June 24, 1955, leaving one surviving child the defendant Sigmund Frendel, father of plaintiffs Philip Frendel and Max Frendel, her husband having predeceased her. Claire Freeman, daughter of the testatrix, died after the will was executed and before the death of her mother, leaving no children and a widower.

*First* — The second item of the will reads:

"I give, bequeath and devise to my beloved daughter, CLAIRE FREEMAN, . . the sum of FIVE THOUSAND DOLLARS."

The contention of Sigmund Frendel that he takes as lineal descendant of his sister Claire is without merit. R. S., Chap. 169, § 10 reads:

"*Certain devisees die before testator, lineal heirs take devise.* - - When a relative of the testator, having a devise of real or personal estate, dies before the testator, leaving lineal descendants, they take such estate as would have been taken by such deceased relative if he had survived."

"The purpose and effect of the statute seem clear. It preserves such a devise from lapsing by sub-

stituting in place of the deceased devisee his lineal descendants. By force of the statute they take under the will in his place, and they take the same estate he would have taken thereunder." *McKellar, Appellant,* 114 Me. 421, 423, 96 A. 734. See also *Morse v. Hayden,* 82 Me. 227, 19 A. 443.

The legacy has lapsed and fallen into the residue.

*Second* — The twenty-second item of the will reads:

"All the rest, residue and remainder of my estate, wherever or however situate, whether same be real, personal or mixed, and if it is necessary to sell any of my personal property to meet the bequests hereinbefore provided, I direct my Executor to sell same, I give, bequeath and devise to my beloved daughter, CLAIRE FREEMAN, my beloved sister, YETTA SHATZER, and my beloved niece, ROSE LYMAN, share and share alike."

The testatrix clearly created a tenancy in common and not a joint tenancy in the residue. The case cannot be distinguished from *Strout* v. *Chesley,* 125 Me. 171, 132 A. 211, "in equal parts share and share alike." For a full discussion of the principles see *Stetson* v. *Eastman,* 84 Me. 366, 24 A. 868. On the death of Claire Freeman before the testatrix, her share in the residue lapsed. We have seen under the second item that Sigmund Frendel does not take as a substitute for his sister. The lapsed legacy from the residue under the terms of this will does not increase the shares of the other residuary legatees, but passes to the heirs of the testatrix as intestate property. *Strout* v. *Chesley, supra; Morse* v. *Hayden, supra; Crocker* v. *Crocker,* 230 Mass. 478, 120 N. E. 110.

Sigmund Frendel, therefore, takes a one-third share of the residue as sole heir of his mother the testatrix, and not as a legatee in substitution for his deceased sister Claire.

*Third* — Savings Bonds. The main question the administrator and other interested parties wish settled is whether certain savings bonds are the property of the estate, or of the surviving co-owners.

In 1945 Rose S. Hall purchased with her own funds nine $1000 U. S. Savings Bonds of Series E, of which eight are payable to "Mrs. Rose S. Hall or Sigmund Frendel," and one payable to "Mrs. Rose S. Hall or Philip Frendel." The bonds were kept in a safe deposit box of the testatrix' sister, the defendant Yetta Scherzer, in New York City. After the death of the testatrix, the bonds were delivered to the administrator. There is no suggestion of any fraud in the purchase and retention of the bonds by the testatrix.

The case is governed in our opinion by *Harvey* v. *Rackliffe*, 141 Me. 169, 41 A. (2nd) 455. See comment 51 A. L. R. (2nd) 167. The court, in an opinion written by Justice Thaxter, held that Treasury Regulations with respect to the transfer of savings bonds had the force and effect of federal law, that the terms of a savings bond constituted a contract between the purchaser and the government for the benefit of a third party, as here Sigmund (or Philip) Frendel, and that the State could not interfere with the relationship so established.

In the *Harvey* case, bonds purchased by A were issued to A payable on death to B. The controversy was between the estate of A, who died before B, and the estate of B. The court held that complete ownership passed to B on A's death and hence to B's estate. The same principle is applicable to the bonds payable to A or B in the case at bar.

The parties agree that the federal laws and regulations in effect in the *Harvey* case are substantially unchanged. The pertinent part of the statute authorizing the issuance of the bonds, as in the *Harvey* case, reads:

"The Secretary of the Treasury, with the approval of the President, is authorized to issue, from time to time, through the Postal Service or otherwise, United States savings bonds and United States Treasury savings certificates, the proceeds of which shall be available to meet any public expenditures authorized by law, and to retire any outstanding obligations of the United States bearing interest or issued on a discount basis. The various issues and series of the savings bonds and the savings certificates shall be in such forms, shall be offered in such amounts, subject to the limitation imposed by section 757b of this title, and shall be issued in such manner and subject to such terms and conditions consistent with subsections (b)-(d) of this section, and including any restrictions on their transfer, as the Secretary of the Treasury may from time to time prescribe." 31 U. S. C. A. § 757c (a).

It is agreed that a regulation with respect to bonds issued in the co-owner form similar to the regulation discussed in the *Harvey* case reads:

"If either coowner dies without having presented and surrendered the bond for payment or authorized reissue, the surviving coowner will be recognized as the sole and absolute owner of the bond and payment or reissue, as though the bond were registered in his name alone, will be made only to such survivor...." 31 Code of Federal Regulations, § 315.45 (1949).

The record also contains Regulations governing United States Savings Bonds issued by the Treasury Department, dated December 26, 1957, which read in part:

"Sec. 315.61. AFTER THE DEATH OF ONE OR BOTH COOWNERS. — If either coowner dies without the bond having been presented and surrendered for payment or authorized reissue, the survivor will be recognized as the sole and absolute owner."

It will serve no useful purpose to set forth in further detail the applicable federal law and regulations. We have reviewed the reasoning underlying the decision in the *Harvey* case and are convinced that it is equally controlling today in the situation before us.

The *Harvey* case has been repeatedly cited with approval by our court in the years since 1945. The inclusion of government bonds (whether payable to A or B, or to A payable on death to B) in estates for inheritance tax purposes has been upheld on the ground the federal regulations specifically provide that bonds are subject to such taxes. *Hallett* v. *Bailey,* 143 Me. 1, 54 A. (2nd) 533; *Gould, Admr.* v. *Johnson,* 146 Me. 366, 82 A. (2nd) 88; *Weeks* v. *Johnson,* 146 Me. 371, 82 A. (2nd) 416.

*Thibeault* v. *Thibeault,* 147 Me. 213, 85 A. (2nd) 177, and *Paulsen* v. *Paulsen,* 144 Me. 155, 66 A. (2nd) 420, involved rights between coowners in the proceeds of bonds cashed during the lifetime of the coowners, and not ownership after death.

Thus since 1945 we find our court has considered the law to be settled by the *Harvey* case. Further, our law is in accordance with the great weight of authority. See *Reynolds* v. *Reynolds* (Mass.), 90 N. E. (2nd) 338 (1950). See also annot. 37 A. L. R. (2nd) 1221. We find no reason to overrule and discard the *Harvey* case.

Article VI, Clause 2, of the Federal Constitution provides:

> "This Constitution, and the Laws of the United States, which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

"We are not asked to overrule a rule of law already established in this state, but only to decide that, because of the

supremacy of Federal law, the state rule has no application. . ." *Harvey* v. *Rackliffe, supra,* at p. 182.

We hold that Sigmund Frendel and Philip Frendel, and not the administrator, are entitled to the bonds.

*Fourth* — The sixteenth and seventeenth items of the will read:

> "I give, bequeath and devise to the JEWISH ORPHAN ASYLUM at Cernoutz, Roumania, the sum of ONE THOUSAND DOLLARS.

> "I give, bequeath and devise to the JEWISH HOSPITAL at Cernoutz, Roumania, the sum of ONE THOUSAND DOLLARS."

The administrator asks with reference to each bequest, "that this court determine what disposition should be made of the bequest . . . and determine to whom, if any one, said bequest should be paid and if not to be paid to any particular person or organization, whether or not said bequest having failed, has lapsed and becomes part of the residue of said estate."

The evidence in substance consists of a stipulation and agreement by the parties that certain persons if present would testify: (1) that the institutions existed before the war, and by inference when the will was executed; (2) that they were destroyed in the occupation by Hitler, or that they have been taken over by the Russian Government, and (3) that in any event under applicable Russian law such institutions are not permitted to accept contributions particularly from the West.

In our opinion the evidence should be presented in admissible form, and not under a stipulation which obviously can bind only the parties agreeing thereto. Further, on the issue of Russian law, assuming the admissibility of the evidence, we have nothing before us to indicate that the person making the statement is an expert in Russian law. In the

absence of adequate proof of the expert knowledge of the witness, we cannot accept his statement as sufficient proof of the applicable foreign law.

Lastly, there are, we believe, important and perhaps decisive questions of state and national policy involved touching payment of legacies behind the "iron curtain." This field cannot well be explored on report. For illustrative cases see *In re Kennedy's Estate* (Cal.) 235 P. (2nd) 837; *Petition of Mazurowski*, 331 Mass. 33, 116 N. E. (2nd) 854; *In re Braier's Estate*, 305 N. Y. 148, 111 N. E. (2nd) 424.

The following New York Surrogate Court opinions are found in 107 N. Y. S., (2nd) Pg. 221, *In re Yee Yoke Ban's Estate* (China); Pg. 224, *In re Best's Estate* (Soviet Union); Pg. 225, *In re Getream's Estate* (Hungary). See also 31 Code of Federal Regulations § 211.3 (a), as amended 22 F. R. 4134, June 12, 1957; 34 C. J. S. Executors and Administrators § 497 (c).

The decision upon the legacies to the institutions need not delay the settlement of the other issues in the case. It seems to us therefore the better course to decline to answer the questions relating to the institutions without prejudice to any interested parties. These questions can be disposed of in other proceedings.

The entry will be

> *Remanded to the sitting Justice for a decree in accordance with this opinion. Costs and reasonable counsel fees to be fixed by the sitting Justice, paid by the personal representative and charged in his probate account.*